Good morning, Your Honor, and may it please the Court, I'm Randall Unger and I represent the appellant Rulis Pierre in this case. I submit that Mr. Pierre's sentence of 84 months in prison was both procedurally and substantively unreasonable. It was procedurally unreasonable because it was based on an erroneous finding that he acted as an investment advisor, a finding that increased his offense level by four levels during the sentencing proceeding. I submit that there was insufficient evidence to establish that Mr. Pierre acted as an investment advisor. In the cases that the government appears to have relied upon, those being the Elliott case from the 11th Circuit and the Abramson case from this Court, although from quite a long time ago, those defendants in those cases clearly held themselves out as investment advisors and in some instances provided frequent investment advice. Well, but there are two possible issues as to whether someone is an investment advisor. Correct me if I'm wrong. One is the provision of investment advice and the other is the receipt of compensation for that. Yes. Right? But isn't it well established as to the first one that if I take your money and have total discretion as to how to invest it, then I am an investment advisor? It's not perhaps the most obvious meaning, but the case law seems to cover that. I understand, and the Court is correct, and that would appear to satisfy at least one of the requirements. Okay, so really you're hanging your hat on the compensation issue. Yes, if you want to characterize it that way. Well, I'm just trying to understand what your arguments are. You can characterize them. I don't want to characterize them. I want to make sure I understand correctly what you're arguing. I think the Court has got it that, in fact, Mr. Pierre was not being compensated. Okay, well, this is what I'm trying to figure out. Is there any evidence that he told these people, listen, I'm just doing this as a favor to you. I don't need to do this, but I'm going to take your money and I don't mean take it, steal it. I'm going to take your money and invest it and make money for you, and that's just being done as a favor. No, Your Honor. Respectfully, he was not acting as a good Samaritan. He never pretended to be in any shape or form. Okay, but you see, the question is, as you put it yourself, what did he hold himself out to be as opposed to what he really did? But we'll put that aside for a moment. It seems to me he held himself out as saying we're going to make so much money with your capital that I'm going to guarantee you this huge return. But, of course, I'm not guaranteeing to pay you everything that is made on your money. If you get above 20 percent return, I'm going to keep it. Right. Isn't that clear, clearly what the agreement contemplates? That's, in essence, what the promises were. Yeah. Looking at it from any common sense. That's totally unrealistic and crazy. I don't think any investor could ever anticipate that kind of return. Well, except they did. Right, I understand. The people that he, I wouldn't say preyed upon, the people that he interacted with are people who were promised this deal and presumably believed it or they wouldn't have taken it. Of course, but it appears to me from my review of the financial records that were introduced during this trial that Mr. Pierre actually lost money as well, his own money, as well as that of his investors. So it wasn't that he What is it you claim he was doing if he wasn't an investment advisor? Well, he was making promises that couldn't be fulfilled. About concerning the possible profitability of investments. Wrongly believing that he could trade in the stock market and somehow beat the market. That may make him a bad investment advisor, but it doesn't make him a non-investment advisor. Well, but my point being that I don't think that the government was really able to establish that he was being compensated. The mere fact that he was taking the money What do you mean that he was being compensated? He had a, in some of these investments, he had an upside share. I'm sorry, I He had an upside share. He was going to make money if the clients made money. Well, yeah, that was the premise, certainly, but it didn't happen. So what? It never could happen because So what if I go to Goldman Sachs and they tell me to buy the Magnificent Seven and then all of a sudden the Magnificent Seven goes down? That doesn't make Goldman Sachs not an investment advisor. I understand. And I'm not saying it's just a matter of negligence. There were certainly deceptions that were displayed in this case, and I'm not running from those. But the point being that I don't believe that there was enough to establish that element for that particular enhancement. And I want to I'm sorry, I don't follow that. You think there was some evidence that he was an investment advisor, but there was not enough evidence? Well, I'm saying that the government had the burden of establishing the complete definition of an investment advisor, and I don't believe they satisfied that. What do you mean the complete definition? Well, in terms of compensation, of receiving compensation for the monies that he was taking from investors. Didn't the district court find, make a factual finding that he placed investors' money in his own bank accounts and spent it on his own expenses? There was certainly co-mingling of funds. Isn't that compensation? Economic benefit is defined very broadly. So if you take investors' money, you put it in your own bank accounts, and you use it, that is taking compensation, isn't it? Well, if there was actual gain by the offender, which I don't think was established in this case. Well, if I take someone else's money and I use it to spend it on my own expenses, wouldn't you call that gain? Well, in that scenario I'm using someone else's money. Yes, I would accept that, of course. If I may just, I know the time is running short, and I wanted to address the substantive reasonableness of the sentence, which I believe was not substantively reasonable. We have basically an unwarranted sentencing disparity in this case between what Mr. Pierre received, which was 84 months' imprisonment, and what the average And it was three months below the guideline range he himself was asking, right? He advocated for a guideline range, irrespective of enhancements, of 87 to 108 months, and he received a sentence below that. I understand, but that's still 60 percent higher than the average defendant who's convicted of the very same type of offense that he was convicted of. But he preyed on little people. He took advantage of the expat Haitian community out in Rockland County and systematically fleeced them. Well, I think every These are people who couldn't afford to, person after person, could not afford to lose, my impression, the money they gave your client and lost. I think in any case involving a fraud where there's a conviction and there's a loss of funds, any victim of that is going to feel that they were obviously taken advantage of and put in a very bad situation. That's not my point. My point is that he targeted the expat Haitian community out in Rockland County and had at it. I mean, it's not like he was targeting big law partners or hedge fund guys. He was targeting little people. Oh, but whoever was targeted in a fraud case is still a victim of the targeter, whether it's a person with huge amounts of funds or small amounts. But if he targets Bill Gates, it seems to me, and you can correct me if I'm wrong, different than if he targets for 15 grand an Uber driver. I take the court's point that I'm not really disagreeing in terms of the degree of harm, but fraud is fraud regardless of who the victim is. Well, well, but it isn't. Fraud isn't fraud regardless of the victim. It isn't fraud regardless of the amount taken, and it isn't fraud regardless of all of the other factors that affect the guideline range, plus all of the other 3553A factors that a judge may take into account in imposing sentence. Right. I guess what I'm trying to understand about your argument, we don't hold that a guideline sentence is automatically reasonable, and that's an official guideline, and we certainly don't hold that it's automatically unreasonable. But you're suggesting that the determinant of what is reasonable is the average. It's sort of like a new guideline, that you consult the average departure rate or variance rate, and anybody who gets more than that is getting an unreasonable sentence? Well, no. If it was a minimal amount greater than the average defendant convicted of a like offense, I don't think I would make that claim. But we're talking about a difference, a disparity of 60 percent of what the average offender is being sentenced to, and that, I thought, is what 3553 is supposed to either reduce or eliminate, that type of discrepancy or disparity. And in this case, yeah, I think it's a fair way to evaluate the reasonableness of the sentence by looking at the nationwide average and saying, okay, look, we don't know in some of those cases whether they were middle class investors or low income. Well, but exactly. The fact is we don't know actually anything about any of those cases, right? I mean, I did not see any comparison of Mr. Pierre to any particular other person to find someone who was just like him and got a lower sentence. I think that would be extremely difficult. Of course it would. Because every case is unique and it's facts. Exactly. But at least when you look at the statistics that the commission publishes, we can get a pretty fair evaluation of the types of sentences that are being imposed on these types of cases. And his, with all due respect, I believe was excessive under all of the circumstances. Thank you. I have reserved some time. Thank you. Good morning, and may it please the Court. David Abramowitz for the United States. I'd like to start by responding to my adversary's arguments about substantive and procedural reasonableness, and then I would actually like to address something very briefly just about on the sufficiency points, even though those didn't come up in the oral argument. Starting with procedural reasonableness, I think as the panel's questions indicated, is well understood here. This defendant meets, the facts here meet the compensation element really in multiple ways. These agreements were structured in a way that clearly would compensate the defendant by giving him all the upside. Now, yes, these were unrealistic promises of extravagant, exorbitant profits that these victims were promised and, of course, never received. But the understanding was, I'm such a good investor, I'm going to get you these exorbitant profits, and anything above this certain threshold is going to be for me to keep. So that's one way, obviously, he was compensated. And then literally he was compensated in that he took some of the money for himself. He misappropriated investor funds. He put some in his own bank accounts. He used some to make payments on personal expenses, as we mentioned in the brief, the Porsche payments for his rented Porsche. That's obviously a form of compensation. Now, ultimately, was he successful financially? No. This collapsed. But Judge Parker, as your question hit on, even if Goldman Sachs is unsuccessful or even if some other financial institution goes bankrupt, that doesn't make them any less an investment advisor just because ultimately things didn't work out for them and they lost more than they gained. On substantive reasonableness, it's really far too crude a measure to look just at people convicted of financial crimes with a similar loss amount. There's really so much more nuance and detail that goes into fashioning an appropriate sentence. In many fraud cases, or some fraud cases at least, there are no identifiable victims, let alone victims of this sort who, as the panel's questions indicated, were particularly vulnerable and unsophisticated. These were people who trusted a member of their community, and the defendant abused their trust. There was testimony from one victim that she now has to work two full-time jobs, one caring for disabled elderly people. These are both full-time, and another one is a customer service representative at a bank. She said she had never worked two full-time jobs before. She had previously worked full-time and part-time, but she lost her savings to this defendant. That's obviously an aggravating factor. In addition, we had multiple fraud schemes here. This wasn't just one fraud. There was the amongst friends fraud. There was the planet wings fraud. There was the embezzlement from the hotel employer. There was also a structuring offense. There was an obstruction of justice that gained a two-point obstruction of justice enhancement that's unchallenged on appeal from the district court. There's no indication that the averages cited by the defendant in the substantive reasonableness argument included those types of aggravating factors. And so this was a sentence that wasn't just below the guidelines, was, as Judge Kahn said, below even the guideline suggested by the defense. And it was eminently reasonable and certainly not conscience-shot. I would just like to finally turn to just one point of clarification on sufficiency, and specifically on the intent arguments. I'm sorry that we did not make this clear in our brief, but I want to make it clear now so we're not contributing to any confusion here. The intent element of securities fraud does not require intent to harm or contemplated harm. And this was made perhaps most clearly in this circuit's case, U.S. v. Litvak, 808 F. 3rd, 160. That was in 2015. Judge Parker, I believe you were on the panel. And to take two quotes from that, the court found that the defendant, quote, is incorrect that contemplated harm is a requisite component of the scienter element of securities fraud. That's at page 165. And also the court said intent to harm is not a component of the scienter element of securities fraud under Section 10B. That's at page 179. And I just wanted to clarify that. Of course, even under a stricter standard, there was ample evidence here of intent, but I wanted to make sure we didn't contribute to any confusion. So unless the panel has any questions, we'll rest on our submission. Thank you. Thank you. No questions. Counsel, you reserved three minutes. We'll give you three minutes. Now, you went way over time on your first argument, but you'll still keep your three minutes. I won't even hold the court to the three minutes. All I wanted to address was a couple of things. One thing I didn't really discuss during my first part of my argument was that, you know, in fraud cases, the sentences are pretty much driven by the loss amount. And I think this court and other courts have recognized that the methodology that's used to basically inflate the offense level based upon the loss amount is something that wasn't really tested by the commission through the empirical approach. It was just decided, well, the more money that is lost, the more serious the offense. I mean, I understand that, but I don't think that because that's the way it was determined. They're just guidelines. I understand. But that's exactly why so many sentences, including your client's, are below the guidelines range. And his was below the guidelines range that he thought was correct, not the guidelines range that the government advocated for. So all of those factors tend to push against the loss. One of those factors being that the guidelines calculated intended loss. So even if nobody lost money, the sentences could be inflated in some cases. That's not this case where people actually did lose their money. And getting back to the argument that I made before, I think essentially because we're talking about, and I get the court's point, of course, that this was below the guidelines. That's something to consider in terms of the reasonableness, but it's not conclusive at all, particularly where you look at the nationwide statistics. And, of course, we can't look at each individual case that was used to compile those statistics. That would turn a sentencing proceeding. What are you suggesting should be done? What are you suggesting is the approach to this problem? Well, my argument would be to, in Mr. Pierre's case, remand the case to the district court with instructions to impose a sentence that's in accordance with what seems to be the nationwide norm or average. I don't know what that means because sentencing is just, as is clear to me, it's not simply a mathematical exercise. I understand. The factors, the guidelines, the commentaries, the guidelines. But when a sentencing judge is confronted with the statistics which show pretty clearly in black and white what the average offender in this type of case is receiving for sentencing. Every defendant is different. Of course. And so every defendant is entitled to an individualized sentence. So the overall statistics, I don't gainsay, might be something that a judge ought to think about. But at the end of the day, there are lots of other factors. Harm to the public, dangerousness, contrition, obstruction. All true. And all these factors need to be considered as well as the importance of not creating an unwarranted sentencing disparity. No question about it. Of course, the average sentence means that some people got more than that and some people got less than that. And possibly that some people got a lot more than that and some got a lot less than that. We're getting into conjecture, though, when we start to. Well, but that's what you're asking us to do. If you say the average sentence is this, are you saying that actually everybody who got more than the average should now be retrospectively resentenced down to the average? I mean, it just doesn't make any sense. There's a range of sentences. It comes out to a particular average. If the judge thought this person is worse than average, that's what the judge thought. I'm not so sure that's what the judge thought. All I'm suggesting is I don't think the judge gave proper consideration to the disparity. And I apologize that it looks like I did take the three minutes.  Thank you.